UNITED LIFE & ACCIDENT INS. CO. OF
CONCORD, NEW HAMPSHIRE
v. WILLOUGHBY.

No. 6072.

United States Court of Appeals
Fourth Circuit.

Argued April 20, 1950.

Decided May 24, 1950.

John W. Thomas, Jr., Columbia, S. C., (Pickney L. Cain, Columbia, S. C., James B. Dixon, Marion, S. C., and Thomas, Cain & Lumpkin, Columbia, S. C., on brief), for appellant.

J. Reuben Long, Conway, S. C., for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal in two companion cases, which were removed from the state to the federal court on the ground of diversity of citizenship, raises the question whether the Insurance Company is liable for double or triple indemnity under two life insurance policies on the life of Cleophus M. Willoughby, a farmer who resided in Horry County, South Carolina. The face amount of each policy was $2500 which was paid by the company upon the death of the insured to Belle Willoughby, his wife, the beneficiary and the plaintiff in the District Court. Each policy also provided in effect that the company would pay to the beneficiary $2500 additional, making $5000 in all, in the event that the death should result directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means, provided such death should not result from homicide; or $5000, making $7500 in all, in the event of such an accidental death in consequence of the collapse of a completed building in which such injuries were received, provided, however, that such death should not result from homicide.

At the conclusion of all the evidence the defendant moved for a directed verdict in its favor on the second cause of action in each case on the ground that the destruction of the house that caused the death of the insured was not such a collapse as was covered by the policy; and the plaintiff moved for a directed verdict in her favor in both cases on the ground that there was no evidence of homicide. The District Judge overruled both motions as he was of the opinion that it was for the jury to decide whether the collapse of the building was caused by accident or by someone's homicide. He instructed the jury in effect to find for the plaintiff on the first cause of action if they should find that the insured came to his death by accidental and violent means, unless they should also find that death occurred as the result of homicide; and that they should find for the plaintiff on the second cause of action if they should find that the accidental and

violent means involved the collapse of the building, unless they should find that the death occurred as the result of homicide.

The indemnity provisions of each policy were given in the alternative, and in no event, was the beneficiary entitled to more than $5,000 in each case in addition to the face of the policy. The judge gave heed to this situation in effect by furnishing the jury with two forms of verdict for use in case they should decide in favor of the plaintiff, and instructed them that if they found for the plaintiff on the first cause of action, their verdict should be for $2500; but if they found for the plaintiff on both causes of action, they should find a verdict of $2500 on each cause of action, or $5,000 in all. The jury found a verdict for the plaintiff on each cause of action, and a judgment for $5000 and interest was entered in each case. The defendant moved the court to set aside the verdicts and judgments and to have a judgment entered in each case in accordance with its motion for a directed verdict.

While the defendant's motion for directed verdict on the second cause of action was on the ground that the evidence did not show such a collapse of the building as was covered by the policy, it is clear that the motion should have been granted if the evidence conclusively established that the building was dynamited. The vital question, therefore, on this appeal is whether the facts permit any inference but that the death of the insured was caused by homicide. There is no dispute that he was killed by injuries received by him while asleep in bed at midnight on April 29, 1948, when his dwelling house was completely demolished and he and his wife were caught beneath heavy timber and debris. She survived and testified in the pending case. Their seventeen year old daughter, who was sleeping in a nearby room, was so completely destroyed that the largest recognizable part of her body remaining was her right hand which was found twelve to fifteen steps from the rear of the foundation of the house. Very small pieces of her body were scattered over an area from twenty to fifty feet distant from the foundation of the house. Beneath the room in which she slept was found a new funnel-shaped hole or crater three to six feet deep and from six to twelve feet wide. The girl was literally blown to bits.

The dwelling house was a one-story frame structure of six rooms, three bedrooms and bath on one side of a central hallway, and living room, dining room and kitchen on the other side. It stood upon 16" cement blocks set upon 2" bases. It had been erected six years previously by the insured himself and was well built, with good supports and timbers throughout. When the catastrophe was discovered by the neighbors shortly after sunrise the next morning, no part of the house was standing except the front and back brick steps and most of the supporting pillars. Three brick chimneys were demolished and scattered among the debris. The furniture was torn and twisted. Witnesses with war experience testified that the destruction was as complete as if the house had been hit by a big artillery shell; and a witness experienced in using dynamite testified that a quantity of dynamite in excess of four sticks would have been required to create the crater beneath the house and cause the complete demolition of the structure.

The nearest neighbor lived between 200 to 300 yards away. He was awakened shortly after midnight by a noise like an airplane which lasted a little while, but he could not tell what it was. It sounded like something collapsed. No foreign substance or airplane parts were found among the ruins.

Although the beneficiary of the insurance policies survived and testified as a witness in the case, there was no evidence tending to show that there was gas or other explosive fuel on the premises that could have caused the destruction of the house; and there was no evidence of fire in the ruins. An investigation by state and federal officials, to ascertain whether the catastrophe was of criminal origin, and to identify the criminal, produced no conclusive results.

One witness for the defendant testified that on two occasions a certain resident of the neighborhood, who was acquainted with the insured, requested him to dynamite the sawmill of the insured so as to kill him, and that the resident shot at the witness' house when he refused the request. The plaintiff produced as witnesses two brothers of the accused person who testified that the accused was 12 or 13 miles away from the house at approximately an hour and a half before it was destroyed; but the accused himself failed to appear as a witness and no explanation of his absence was offered. There was some examination of the charge by the Grand Jury of the county but no bill of indictment was found.

In our opinion it is unreasonable, if not impossible, to draw any inference from the admitted facts but that the house was deliberately blown up for the fiendish purpose of destroying one or more of its occupants, and that a criminal homicide was actually committed in the killing of the insured and his daughter. It is conceivable, although improbable, that a comparatively new house, apparently well built of good materials, might collapse from some hidden inherent defect; and this possibility might have justified the submission of the question to the jury, if the evidence had shown merely the disintegration of the building and the injuries suffered by the insured and his wife when the timbers fell upon them as they lay asleep. But no such theory can explain the fact that the body of the daughter was not crushed by falling debris, but was torn to pieces and scattered over an area that extended a considerable distance in various directions from her bed. This ghastly circumstance and the existence of the crater beneath her room demonstrate with certainty that an explosion took place; and since there was nothing on the premises to have caused the explosion accidentally, there is no other reasonable inference but that it was deliberately caused with criminal intent. It is immaterial that the identity of the criminal has not been established for, as the judge correctly ruled, it is sufficient for the purposes of this case to show that the death of the insured resulted from homicide.

This conclusion disposes of the crucial question in issue. The defendant's motion for directed verdict on the second cause of action in each case should have been granted; and the judgment thereon must be set aside. This action necessarily requires the reversal of the entire judgment in each case, since homicide is a complete defense to both causes of action and it would be inconsistent and anomalous to give judgment for the defendant on one cause of action and deny it on the other. For the same reason the motion of the defendant for judgment n.o.v. must be denied, since it was directed only to the first cause of action.

The judgment in both cases will be reversed and the cases remanded for a new trial at which the verdict should be directed for the defendant on both causes of action unless evidence is offered to overcome the inference which points unmistakably to the homicidal destruction of the building.

Reversed and remanded.